UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EARL D. BOOTH,

       Plaintiff,

v.

SCOTT FINK, *et al.*,

       Defendants.

Case No. 22-cv-10166

Hon. Matthew F. Leitman

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF No. 6)

On August 17, 2020, the Michigan Department of Corrections (the "MDOC" or the "Department") issued a policy directive that governs the use of social media by its employees (the "Social Media Policy"). The Social Media Policy bars MDOC employees from, among other things, making social media posts that "impair working relationships, impede the performance of duties, or negatively affect the public perception of the Department."

In this action, Plaintiff Earl D. Booth, a corrections officer employed by the MDOC, claims that the Social Media Policy violates the First Amendment. In a motion now before the Court, Booth seeks a preliminary injunction barring the MDOC from enforcing the Social Media Policy to the extent that the policy prohibits off-duty, off-worksite private speech. Booth has raised serious and legitimate

concerns about the constitutionality of at least one aspect of the Social Media Policy: the provision of the policy barring MDOC employees from making posts that "negatively affect the public perception of the Department." Indeed, at least two circuit courts of appeals have ruled that similar restrictions on public-employee speech run afoul of the First Amendment. But the Sixth Circuit has taken a different view. It has rejected First Amendment facial challenges to public-employee speech restrictions like those contained in the Social Media Policy. For the reasons explained in more detail below, the Sixth Circuit's governing decisions compel the Court to **DENY** Booth's motion for a preliminary injunction.

# I

## A

The MDOC is a state agency that operates correctional institutions throughout the State of Michigan. (*See* MDOC About Us, https://www.michigan.gov/corrections/about/org-structure.) The MDOC has issued numerous written Policy Directives that govern the conduct of its employees. One such directive is the Social Media Policy (MDOC Policy Directive 01.04.106), which provides "[g]uidelines for [the] use of social media by [MDOC] employees." (Social Media Policy, ECF No. 6-2, PageID.49.)

The Social Media Policy begins by acknowledging that "[e]mployees are free to express themselves as private citizens on social media sites." (*Id.* at ¶D, PageID.49.) But the Social Media Policy then limits the expressive rights of MDOC employees by prohibiting social media posts that "impair working relationships, impede the performance of duties, [… or] negatively affect[] the efficiency of the Department." (*Id.*) The Social Media Policy also bars social media posts that "negatively affect the public perception of the Department" (the "Negative Perception Provision"). (*Id.*)

**B**

Booth works for the MDOC as a "corrections officer (*i.e.*, a [prison] guard) at the Charles E. Egeler Reception & Guidance Center." (Booth Decl. at ¶4, ECF No. 6-3, PageID.51.) The Egeler Reception & Guidance Center is a correctional institution located in Jackson, Michigan. (*See id.*)

On his "own personal time," Booth maintains a private Facebook account that he "operate[s]" in his "private personal name." (*Id.* at ¶5, PageID.51.) Booth "do[es] not make social media posts [on that account] while [he is] at work." (*Id.* at ¶6, PageID.51.)

Booth's "posts range from the silly to the serious." (Compl. at ¶12, ECF No. 1, PageID.3.) For example, Booth "shares [posts] with family and friends about his travels and leisure activities." (*Id.* at ¶14, PageID.4.)

3

Booth also posts about his job as an MDOC corrections officer.  "For example, on March 25, 2021, [Booth] posted videos [on his Facebook account] showing him being 'sucker punched' by a prisoner and the resulting public sentencing hearing held by Judge John McBain in the Jackson County Circuit Court." (*Id.* at ¶17, PageID.4-5.)  Booth says the videos of the sucker punch "were supplied to [him] by the Jackson County Prosecutor's Office," which used the videos in a criminal prosecution of the inmate who delivered the punch. (Booth Decl. at ¶7, ECF No. 6-3, PageID.51.)  When Booth posted the videos of the sucker punch, he included text in the post that appeared to criticize at least one other employee of the MDOC who was working at the time Booth was attacked. (*See* Compl. at ¶17, ECF. No. 1, PageID.5.)

In a separate Facebook post, Booth posted a copy of an internal MDOC report concerning discipline imposed on another MDOC employee, Bill Alexander. (*See id.* at ¶¶ 42-43, PageID.9-10.)  Booth says he did so because Alexander "was not being held responsible for his violation(s) of governmental policies by the Department." (*Id.* at ¶43, PageID.10.)

Finally, Booth posted comments related to the job performance of both MDOC Director Heidi Washington and MDOC Deputy Director, Jeremy Bush. (*See id.* at ¶45, PageID.10.)

## C

Booth claims that as a result of his post about the sucker punch (and the other posts discussed above), the MDOC began investigating whether he violated the Social Media Policy. (*See id.* at ¶20, PageID.5.)  Booth appears to have become aware of this investigation on January 19, 2022.  On that date, Defendant Scott Fink, an MDOC investigator, interviewed Booth. (*See id.* at ¶28, PageID.7.)   During the interview, Fink told Booth that the MDOC was investigating him because it had received a complaint that he posted videos of the sucker punch on his Facebook account. (*See id.* at ¶30, PageID.7.)  Fink said that the release of those videos potentially violated both the Social Media Policy and other MDOC work rules that prohibit employees from releasing "protected internal video[s]" to the public. (*Id.*; *See also* Audio of Fink-Booth Interview, ECF No. 9.)

Fink also questioned Booth about his Facebook posts concerning Alexander, Washington, and Bush discussed above. (*See* Compl. at ¶¶ 41-45, ECF No. 1, PageID.9-10.)  Fink told Booth that "materials posted that were 'obtained through [an] employee's professional duties and responsibilities may not be protected under the First Amendment and may form the basis for discipline if deemed detrimental to the Department.'" (*Id.* at ¶35, PageID.8.)  Fink also said that under the Social Media Policy and other work rules that applied to Booth, Booth was "not allowed to 'post

anything that is belittling or degrading or is an attempt to humiliate or can be construed as humiliating to an employee or the Department." (*Id.* at ¶46, PageID.10.)

Fink's investigation of Booth has not been completed, and the MDOC has not, as of the date of this order, taken any disciplinary action against Booth as a result of any of his social media posts or any purported violation of the Social Media Policy.

### D

Booth says that he "want[s] to and intend[s] to make additional social media posts onto [his] personal Facebook page about matters involving the [MODC] and/or its officials," but he is "highly concerned that when [he] make[s] any new posts about matters of public concern, the [MDOC] will use the Social Media Policy […] to punish [him]." (Booth Decl. at ¶¶ 8-9, ECF No. 6-3, PageID.52.)  Booth insists that this fear "causes [him] to second-guess if [he] can make additional social media posts onto [his] personal Facebook page that are in any way involving the [MDOC] and/or its officials." (*Id.* at ¶9, PageID.52.)

### E

On January 26, 2022, Booth filed this action against Washington and Fink in their official capacities. (*See* Compl., ECF No. 1.)  Booth contends that the Social Media Policy violates the First Amendment both "facially and as applied to his particular circumstances." (Booth Supp. Br., ECF No. 10, PageID.63.)   He claims that the Social Media Policy "is facially invalid" because (1) it "reaches 'a

substantial amount of constitutionally protected conduct'" and (2) "a substantial number of instances exist in which the [Social Media Policy] cannot be applied constitutionally." (Booth Resp. to Mot. to Dismiss, ECF No. 16, PageID.241, quoting *Speet v. Schuette*, 726 F.3d 867, 872, 878 (6th Cir. 2013).)  Booth also asserts that "[e]ven if the Social Media Policy is not facially invalid, it is unconstitutional as applied to [his] off-work, private speech." (*Id.*, PageID.248.)

In his Complaint, Booth brings two Counts against Washington and Fink.  In Count I, Booth asserts that the Social Media Policy "is an unconstitutional prior restraint" on his right to free speech. (Compl. at ¶50, ECF No. 1, PageID.11.)  In Count II, he claims that "[t]he Social Media Policy has impaired and continues to impair [his] ability to freely speak by chilling and/or prohibiting his constitutionally protected private speech due to the improper creation, ongoing existence, and/or enforcement of the [policy]." (*Id.* at ¶57, PageID.12.)

Booth seeks both declaratory and injunctive relief.  He first asks the Court to declare that that the Social Media Policy "violates the First Amendment to the United States Constitution." (*Id.* at ¶61(a), PageID.13-14.)  He also asks the Court to "prospectively enjoin Fink and Washington from generally enforcing all or that part of the Social Media Policy that impinges upon and/or precludes First Amendment protected speech as violating the First Amendment to the United States Constitution." (*Id.* at ¶61(e), PageID.15.)

**F**

Shortly after Booth filed his Complaint, he filed a motion for a preliminary injunction. (*See* Mot., ECF No. 10.)  Importantly, this motion is tied to Booth's facial challenge to the Social Media Policy rather than to Booth's as-applied challenge to the policy.  More specifically, Booth asks the Court to bar the Defendants from enforcing the Social Media Policy in its entirety with respect to "off-duty, off-campus private speech":

> [T]he Court is requested to enter a preliminary injunction against Defendants and all those other persons who are in active concert or participation with Defendants from enforcing the Social Media Policy to the extent that makes it punishable or attempts to make it punishable to undertake off-duty, off-campus private speech activity (i.e. posting on social media) including that speech that is alleged to "negatively affect the public perception of the Department."

(*Id.*, PageID.45.)  Booth does not seek to enjoin Fink's ongoing investigation of his (Booth's) alleged violation of the Social Media Policy and/or any specific application of the Social Media Policy against him.

The Court held a video hearing on the motion on, September 7, 2022.

**II**

A preliminary injunction "is an extraordinary and drastic remedy." *S. Glazer's Distribs. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). Although the movant "is

not required to prove his case in full at a preliminary injunction hearing," *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), a preliminary injunction should not "be granted lightly." *S. Glazer's*, 860 F.3d at 849.

A district court balances four factors when considering a motion for a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Id.* (quotations omitted).

"[T]hese are factors to be balanced, not prerequisites to be met." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[N]o one factor is controlling." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). However, "[w]hen evaluating these factors for an alleged constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Thompson v. DeWine*, 959 F.3d 804, 807 (6th Cir. 2020) (internal quotation marks omitted). More specifically, "[i]n First Amendment cases" like this one, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because ... the issues of the public interest and harm to the respective

9

parties largely depend on the constitutionality of the [state action]." *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (internal quotation omitted). ˌ

### III

### A

The Court begins with the most important factor: whether Booth has shown a strong likelihood of prevailing on his facial challenge to the Social Media Policy. He has not.

Where, as here, "a plaintiff makes a facial challenge under the First Amendment [….], the facial challenge is an overbreadth challenge." *Speet*, 726 F.3d at 872 (internal quotation marks omitted). "In analyzing such challenges in the public employment context," courts apply a two-part test first described in *United States v. Nat'l Treasury Employees Union (NTEU)*, 513 U.S. 454, 466-68 (1995). *Hernandez v. City of Phoenix*, 43 F.4th 966, 980 (9th Cir. 2022). Courts "first ask whether the challenged restriction applies to employees' speech in their capacity as private citizens on matters of public concern. If it does, [courts] then ask whether the government has an adequate justification for treating its employees differently from other members of the general public." *Id. See also NTEU*, 513 U.S. at 466 (explaining that if speech "involve[s] a matter of public concern" at step one of a court's analysis, then court must ask if the government can "justif[y]" its restriction on that speech); *Graham v, City of Mentor*, 118 F. App'x 27, 31 (6th Cir. 2004)

(quoting and applying *NTEU* when determining whether speech policy applied to police officers was facially unconstitutional). "Because the challenge in this context targets a prospective restriction on a broad category of expression, rather than punishment imposed after-the-fact for a specific instance of speech, the government bears a heavier burden to justify the scope of the restriction." *Hernandez*, 43 F.4th at 980. It "must show that the combined First Amendment interests of the public and current and future employees are outweighed by the speech's 'necessary impact on the actual operation' of the Government." *Id.* (quoting *NTEU*, 513 U.S. at 468). "A restriction on speech is facially overbroad if, applying this standard, a substantial number of its applications are unconstitutional, judged in relation to the provision's plainly legitimate sweep." *Id.* (internal punctuation omitted). *See also Speet*, 726 F.3d at 872 (same).

## B

Booth has satisfied step one of the *NTEU* test. He has shown that the Social Media Policy applies to private speech on "matter[s] of public concern." *NTEU*, 513 U.S. at 466. Indeed, the Defendants do not seem to dispute that the Social Media Policy applies to such speech.

**C**

Booth has not satisfied step two of the *NTEU* test.  He has not shown that the Social Media Policy is overbroad because a "substantial number" of applications of the policy are unconstitutional. *Hernandez*, 43 F.4th at 980.

In analyzing the alleged overbreadth of the Social Media Policy, it is helpful to divide the policy into two components: the Negative Perception Provision, on one hand, and all of the other speech restrictions in the policy, on the other hand. Dividing the analysis of the Social Media Policy in this manner makes sense because, as explained below, the two components of the policy stand on different constitutional footing.

**1**

The Court begins with all of the provisions of the Social Media Policy *other than* the Negative Perception Provision (*i.e.*, the portions of the policy that bar social media posts that "impair working relationships, impede the performance of duties, [… or] negatively affect[] the efficiency of the Department").  (Social Media Policy at ¶D, ECF No. 6-2, PageID.49.)  Courts have repeatedly rejected facial challenges to these kinds of provisions.  For example, in *Hernandez*, *supra*, plaintiffs brought a facial challenge to the social media policy enacted by their employer, the City of Phoenix Police Department. *See Hernandez*, 43 F.4th at 972.  The policy in dispute

in *Hernandez* echoed the Social Media Policy here and prohibited many of the same categories of speech. It provided that:

> Department personnel are free to express themselves as private citizens on social media sites to the degree that their speech does not impair working relationships of this Department, are detrimental to the mission and functions of the Department, that undermine respect or public confidence in the Department, cause embarrassment to the Department or City, discredit the Department or City, or undermine the goals and mission of the Department or City.

*Id.* at 974. The district court "rejected plaintiffs' facial overbreadth challenge on the ground that the [defendant's] social media policy prohibited only those categories of speech that could reasonably be expected to disrupt the [defendant's] mission and operations." *Id.* at 975. On appeal, the Ninth Circuit "largely agree[d]." *Id.* at 980. The Ninth Circuit concluded that the defendant had "a legitimate interest in prohibiting embarrassing or discrediting speech to the extent such speech could reasonably be expected to disrupt the workplace, hinder the Department's mission, or undermine the public's confidence in and respect for the Department." *Id.* at 981. It explained that:

> [G]overnment employers have a strong interest in prohibiting speech by their employees that undermines the employer's mission or hampers the effective functioning of the employer's operations. *Rankin*, 483 U.S. at 388, 390, 107 S.Ct. 2891; *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684. That interest justifies the policy's restrictions on social media posts that are "detrimental to the mission and functions of the Department" or which "undermine the

goals and mission of the Department or City." […] Given how closely these clauses of the policy track interests that the Department may constitutionally pursue, we cannot say that a "substantial number" of the policy's applications are unconstitutional, judged in relation to the policy's "plainly legitimate sweep." *Stevens*, 559 U.S. at 473, 130 S.Ct. 1577.

*Id.*

Likewise, the Sixth Circuit has rejected challenges to employee speech restrictions like the Social Media Policy. The Sixth Circuit first did so in *Brown v. City of Trenton*, 867 F.2d 318 (6th Cir. 1989). In *Brown*, a group of Trenton police officers wrote a letter to the Chief of Police "explain[ing] why the officers were, as they put it, sufficiently 'fed up' to quit" the department's Emergency Response Tactical Team. *Id.* at 319. In response, the Chief of Police disciplined the officers under a policy (enacted as part of a municipal code) that prohibited speech critical of the police department. The policy provided as follows:

> Section 26–25(a) of the Trenton City Code lists thirty-three offenses for which police officers may be disciplined. Among them are "[c]owardice," "[g]eneral incompetency," "[c]onduct unbecoming an officer," "[u]sing coarse, profane or insolent language ... to any citizen," and "[i]mmorality." A member of the police department found guilty of any of the listed offenses is subject to "reprimand, suspension, forfeiture of pay, dismissal or ... such other lawful punishment as the chief of police may direct." The particular offenses for which the plaintiffs were disciplined were those described in subsection (20), "[p]ublicly criticising [sic] orders given by a superior officer", and (21), "[c]ommunicating or giving information to any person concerning the business

14

of the police department, which is detrimental to the police department."

*Id.* at 323.

The officers then brought a federal civil action in which they claimed that both the discipline imposed upon them and the policy under which they were disciplined (on its face) violated the First Amendment. The district court rejected both challenges and the Sixth Circuit affirmed. The Sixth Circuit first highlighted "the importance of deference to [a] city's judgment on the matter of discouraging public dissension within its safety forces." *Id.* at 322. It further stressed that a police chief should "not [be] required to 'tolerate action which [the chief] reasonable believed would disrupt the office, undermine his authority, and destroy close working relationships.'" *Id.* at 323 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)). Finally, the Sixth Circuit rejected the officers' facial challenge to the speech policy. The court upheld the policy because the officers had not shown that it had been "misused" against them and because "[t]here [was] no showing of any likelihood of substantial misuse of the [policy], and no showing that the [policy's] mere existence is calculated to discourage the exercise of any constitutional right." *Id*. at 324.

Seventeen years later, in *Cherry v. Pickell*, 188 F. App'x 465 (6th Cir. 2006), the Sixth Circuit upheld a sheriff office's imposition of discipline under an employee speech policy that was similar to the Social Media Policy. The policy in *Cherry* provided that:

15

> Office of the Sheriff Genesee County employees shall not
> make public statements through verbal, written or any
> other form of expression, criticizing or ridiculing the
> Sheriff's Office, its policies or other employees, when
> such statement brings the Sheriff's Office into
> disrepute. Statements which are defamatory, obscene,
> unlawful or which may impair the operation or efficiency
> of the Sheriff's Office, interfere with [ ... ] discipline or
> which show a reckless disregard for the truth, are likewise
> prohibited.

*Id.* at 470-71. The plaintiffs argued that the policy impermissibly chilled future critical speech. *See id.* The Sixth Circuit, applying *Brown*, held that the sheriff office's application of the policy was permissible based on the office's interest in "maintaining discipline and decorum within its ranks":

> McIntyre's claim that the Department chilled protected
> expression by warning him that if he engaged in future
> critical speech against the Department he would suffer
> consequences also fails under the *Pickering* standard due
> to the Department's interest in maintaining discipline and
> decorum within its ranks. [....]

> In *Brown,* we upheld against facial and as-applied
> challenges a similar code that prohibited police officers
> from "publicly criticizing orders given by a superior
> officer" or "communicating or giving information to any
> person concerning the business of the police department
> which is detrimental to the police department." 867 F.2d
> at 320. We emphasized, "It is one thing for police officers
> to take a dim view of their boss privately, and quite another
> thing for them to suggest publicly that they are looking
> forward to his administration being replaced by one with
> different priorities." *Id.* at 322–23. Furthermore, we noted
> that there was "no showing of any likelihood of substantial
> misuse of the code, and no showing that the code's mere
> existence is calculated to discourage the exercise of any

constitutional right." *Id.* at 324; *see also Graham v. City of Mentor,* 118 Fed. Appx. 27 (6th Cir. 2004) (upholding the constitutionality of a similar police code against facial and as applied challenges), *cert. denied,* 546 U.S. 815, 126 S.Ct. 340, 163 L.Ed.2d 51 (2005).

The deputies in this case have not demonstrated that the Work Rules and Regulations were calculated to discourage constitutionally protected speech. In alerting McIntyre to these rules after hearing that McIntyre had publicly criticized the Sheriff, the Undersheriff did not stray outside the bounds of what we have considered permissible in the context of paramilitary organizations like the Genesee County Sheriff's Department. See *McMurphy v. City of Flushing,* 802 F.2d 191, 198 (6th Cir. 1986); *see also Connick,* 461 U.S. at 154, 103 S.Ct. 1684. Accordingly, we affirm the district court's grant of summary judgment to the Department with respect to McIntyre's alleged conversation.

*Id. See also Graham*, 118 Fed. App'x at 31(rejecting facial attack on policy that prohibited police officers from, among other things, offering public criticism of the department).

Finally, in *Boulton v. Swanson*, 795 F.3d 526 (6th Cir. 2015), the Sixth Circuit explained that its earlier decisions in *Brown*, *Cherry*, and *Graham* foreclosed facial challenges to a sheriff office's policy prohibiting speech that impeded the office's operations. *Boulton*, like *Cherry* before it, arose out of discipline imposed by the Genesee County Sheriff under the speech policy quoted above. The plaintiff in *Boulton* argued that the imposition of the discipline under that policy violated his First Amendment rights, and he sought to hold the county liable for the violation. In

response, the county argued that Sixth Circuit "precedent bar[red] *any* claim arising from the criticism policy." *Id.* at 536 (emphasis added).  The Sixth Circuit disagreed. It explained that its precedent (1) *did* bar a facial challenge to speech prohibitions like the sheriff's criticism policy, but (2) did not bar an as-applied challenge to such prohibitions:

> As the County acknowledged at argument, our precedent does not foreclose a properly supported as-applied challenge to the Genesee County policy, or policies like it. *Cherry, Brown,* and *Graham* held that, in light of the heavy government interest in promoting order within a law enforcement agency, criticism policies are not *facially* unconstitutional.

*Id.* (emphasis in original).

Given the Sixth Circuit's clear statement that its precedent forecloses a facial challenge to policies that prohibit speech by law enforcement personnel that threatens departmental order and operations, Booth cannot show a likelihood of success that the provisions of the Social Media Policy other than the Negative Perception Provision are invalid on their face.  These provisions – which prohibit posts that "impair working relationships, impede the performance of duties, [… or] negatively affect[] the efficiency of the Department" – closely resemble the policies upheld in *Brown*, *Cherry*, and *Graham*, and are likely not unconstitutional on their

18

face because they further the "heavy government interest in promoting order within a law enforcement agency." *Boulton*, 795 F.3d at 536.[1]

Booth counters that the Sixth Circuit cases discussed above do not control here because they involved speech restrictions adopted by law enforcement agencies rather than by departments of corrections. He says that courts have approved greater

---

[1] In *Brown*, the Sixth Circuit appeared to suggest that it would entertain a facial challenge to a law enforcement agency's policy banning criticism of the agency if a plaintiff could show that (1) the policy was "calculated to discourage the exercise of any constitutional right" or (2) there was a "likelihood" of a "substantial misuse" of the policy. *Brown*, 867 F.2d at 324. Assuming *arguendo* that the Sixth Circuit retains that view – and that may not be the case given that court's statement in *Boulton* that its precedent forecloses a facial challenge to law enforcement criticism policies – Booth is still not entitled to a preliminary injunction barring enforcement of the Social Media Policy now. He has not made a substantial showing that the MDOC adopted the Social Media Policy in order to discourage its employees from exercising their First Amendment rights, nor has he shown a likelihood of substantial misuse of the policy. At this point, he has shown only that one MDOC internal affairs investigator conducted an investigation into a handful of social media posts that he (Booth) made. He has not shown that any other MDOC official has enforced the policy against any other MDOC employees in a manner that raises any constitutional concerns. Moreover, he has not shown that he was actually disciplined under the policy. Booth may be able demonstrate a likelihood that the Social Media Policy was adopted to discourage the exercise of constitutional rights or is subject to substantial misuse, but he has not yet done so. Booth is free to re-raise these arguments on a fully developed factual record following discovery. *See*, *e.g.*, *Hernandez*, 43 F.4th at 981 (explaining that "in the absence of a developed factual record," it is difficult for a court to rule as a matter of law whether "clauses prohibiting speech that would embarrass or discredit" a law enforcement agency are or are not facially overbroad); *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281-83 (4th Cir. 2013) (acknowledging that discovery may be appropriate in the context of a First Amendment facial challenge); *Free Speech Coal., Inc. v. Att'y Gen. of the U.S.*, 677 F.3d 519, 538 (3d Cir. 2012) (acknowledging that development of full factual record may be helpful in the context of a facial challenge).

speech restrictions on law enforcement officers because they perform "public facing" roles, and he claims that this rationale for permitting speech restrictions does not apply to him because he does not interact with the public. (Booth Resp. to Mot. to Dismiss, ECF No. 16, PageID.244-246.)

The Court disagrees with Booth's reading of the controlling cases. In the Sixth Circuit decisions described above, the court did not allow the speech restrictions on the ground that the law enforcement officers played public-facing roles. Instead, the court found the restrictions justified by "the heavy government interest in promoting order within a law enforcement agency." *Boulton*, 795 F.3d at 536. And that interest applies with equal force within a department of corrections. Like a police department, a department of corrections is a "paramilitary" organization in which "authority" must be "respected." *Gillard v. Norris*, 857 F.2d 1095, 1100 (6th Cir. 1988) (quotation omitted). For that reason, courts have treated the application of speech restrictions to corrections officers much like they treat the application of such restrictions to law enforcement officers. *See Volkman v. Ryker*, 736 F.3d 1084 (7th Cir. 2013) (explaining that because police departments and corrections agencies are both "paramilitary" organizations, the "same logic" that justifies restrictions on speech by law enforcement officers justifies restrictions on speech by corrections officers). Finally, Booth has not cited a single case in which any court has held that restrictions on speech by corrections officers should be

evaluated differently than restrictions on speech by law enforcement officers. For all of these reasons, Booth has failed to show a substantial likelihood that the Sixth Circuit cases cited above do not control here.

Under all of these circumstances, Booth has not shown a substantial likelihood that the provisions of the Social Media Policy apart from the Negative Perception Provision are unconstitutionally overbroad.

2

Booth's challenge to the Negative Perception Provision presents a much closer and more difficult question. But he nonetheless has failed to persuade the Court that he is substantially likely to succeed on his facial challenge to that provision.

Booth argues that the Negative Perception Provision is substantially overbroad because it has "astonishing breadth" (Booth Supp. Br., ECF No. 10, PageID.74) and prohibits him from "undertake[ing] *any* expressive activity on social media if it 'negatively affect[s] the public perception of the Department' even when off-duty." (Mot., ECF No. 6, PageID.41; emphasis added). That is a serious argument with real force. Indeed, several courts of appeals have found provisions of social media policies like the Negative Perception Provision to be substantially overbroad for the same reasons advanced by Booth. For example, in *Liverman v. City of Petersburg*, 844 F.3d 400 (4th Cir. 2016), the United States Court of Appeals

for the Fourth Circuit considered the constitutionality of a police department's social

media policy that prohibited "the dissemination of any information that would tend

to discredit or reflect unfavorably upon the [Police] Department." *Id.* at 404 (internal

punctuation omitted).  The "central provision" of that policy – which the court called

the "Negative Comments Provision" – was substantially similar to the Negative

Perception Provision.  It barred speech that could negatively impact the "public

perception" of the police department:

> Negative comments on the internal operations of the
> Bureau, or specific conduct of supervisors or peers that
> impacts the public's perception of the department is not
> protected by the First Amendment free speech clause, in
> accordance with established case law.

*Id.*

The Fourth Circuit held that the Negative Comments Provision was

"unconstitutionally overbroad." *Id.* at 407.  The court first highlighted the

"astonishing breadth" of that provision:

> [T]he restraint is a virtual blanket prohibition on all speech
> critical of the government employer. The explicit terms of
> the Negative Comments Provision prevent plaintiffs and
> any other officer from making unfavorable comments on
> the operations and policies of the Department, arguably
> the "paradigmatic" matter of public concern. *Sanjour v.
> EPA*, 56 F.3d 85, 91 (D.C. Cir. 1995); see also *Roe*, 543
> U.S. at 80, 125 S.Ct. 521.
>
> [….]

> The policy seeks to prohibit the dissemination of any information on social media "that would tend to discredit or reflect unfavorably upon the [Department]." J.A. 161. In particular, the Negative Comments Provision proscribes "[n]egative comments on the internal operations of the Bureau"—which could be just about anything—or on the "specific conduct of supervisors or peers"—which, again, could be just about anything. J.A. 162.

*Id.* at 407-08.

The court then noted that both the employees whose speech was restricted by the policy and the public at large had a substantial interest in speech that could be prohibited by the policy:

> The interests of "present and future employees" and their "potential audiences" in such speech is manifestly significant. See *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003. We do not, of course, discount the capacity of social media to amplify expressions of rancor and vitriol, with all its potential disruption of workplace relationships that *Connick* condemned. But social networking sites like Facebook have also emerged as a hub for sharing information and opinions with one's larger community. And the speech prohibited by the policy might affect the public interest in any number of ways, including whether the Department is enforcing the law in an effective and diligent manner, or whether it is doing so in a way that is just and evenhanded to all concerned. The Department's law enforcement policies could well become a matter of constructive public debate and dialogue between law enforcement officers and those whose safety they are sworn to protect. After all, "[g]overnment employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). But this policy will cut short all of that. To

> repeat, it squashes speech on matters of public import at
> the very outset.

*Id.*

"Because the [defendant's] social networking policy unmistakably impose[d] a significant burden on expressive activity," the court then "consider[ed] whether the [defendant] ha[d] adequately established 'real, not merely conjectural' harms to its operations." *Id.* at 408 (quoting *NTEU*, 513 U.S. at 475)).  It concluded that while the defendant had shown "generalized allegations of budding divisiveness" from the restricted speech, the defendant had "fail[ed] to satisfy its burden of demonstrating actual disruption to its mission." *Id.*  The court therefore held that the social networking policy was unconstitutionally overbroad. *See id.* at 409.

The Eleventh Circuit reached the same conclusion in *O'Laughlin v. Palm Beach County*, 30 F.4th 1045 (2022).  In *O'Laughlin*, two firefighters challenged provisions of their department's social media policy.  One provision of the policy barred social media posts that "could reasonably be interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public." *Id.* at 1049.  The Eleventh Circuit concluded that that provision "suffer[ed] from the same sort of 'astonishing breadth'" as the policy in *Liverman* because it could be applied to "'just about anything.'" *Id.* (quoting *Liverman*, 844 F.3d at 408).  The court therefore held that the policy was substantially overbroad. *See also Barone v. City of Springfield, Oregon*, 902 F.3d

1091, 1107 (9th Cir. 2018) (holding that provision of employment agreement that prohibited employee from "from saying or writing anything negative about the Department, the City, or their employees" was unconstitutionally overbroad).

The Court finds these out-of-circuit decisions to be well-reasoned and persuasive, but the Court may not enjoin enforcement of the Negative Perception Provision based upon these decisions. That is because the decisions cannot be reconciled with the line of Sixth Circuit cases described in detail above.

In those cases, the Sixth Circuit declined to bar enforcement of speech policies enacted by law enforcement agencies that contain provisions much like the Negative Perception Provision. To repeat, in *Brown*, the Sixth Circuit rejected a facial challenge to a provision of a speech policy that prohibited "communicating or giving information to any person concerning the business of the police department which is detrimental to the police department." *Brown*, F.2d at 320. In *Cherry,* the Sixth Circuit likewise declined to preclude enforcement of a social media policy that barred public statements that could "bring[] the Sheriff's Office into disrepute." *Cherry*, 188 F. App'x at 470. Finally, in *Boulton*, the Sixth Circuit explained that under its precedent, the speech prohibition in *Cherry* and others like it "are not facially unconstitutional." *Boulton*, 795 F.3d at 536 (emphasis removed). The speech prohibitions upheld by the Sixth Circuit seem just as broad as the speech prohibitions that the Fourth and Eleventh Circuits struck down as substantially

overbroad in *Liverman* and *O'Laughlin*.  Indeed, it is hard to see a meaningful difference between a prohibition on speech that brings a sheriff's office "into disrepute" – which the Sixth Circuit says "is not facially unconstitutional" – and prohibitions on speech that "would tend to discredit or reflect unfavorably" upon a police department – which the Fourth Circuit found "astonishing[ly]" overbroad. Given the conflict between the controlling Sixth Circuit precedent and the out-of-circuit cases, this Court cannot follow the latter cases.

Just as it is hard to see a material difference between the prohibitions upheld by the Sixth Circuit and disapproved by the other circuits, it is tough to see a distinction between the speech prohibitions allowed by the Sixth Circuit and the Negative Perception Provision.  The Negative Perception Provision bans speech that "negatively affect[s] the public perception" of the MDOC.  That seems a lot like the prohibitions on speech that could "bring[] the Sheriff's Office into disrepute" and on speech that could be "detrimental to the department" that the Sixth Circuit has upheld. Moreover, Booth has not cited any case in which the Sixth Circuit has disapproved of a speech prohibition like the Negative Perception Provision that was enacted by a "paramilitary" organization such as the MDOC.  Indeed, when the Court asked Booth's counsel at the hearing on his motion to identify his "best" and most favorable case in the Sixth Circuit, counsel candidly conceded there were none. Given the state of the law in this Circuit that permits enforcement of law enforcement

26

speech restrictions much like Negative Perception Provision, this Court cannot conclude that the Negative Perception Provision is likely unconstitutional.[2]

## IV

Booth has also failed to show that the three remaining injunction factors weigh in favor of granting his requested injunctive relief.  While the Court acknowledges that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), because Booth has failed to show a substantial likelihood that the Social Media Policy violates the First Amendment, he has also failed to show he is likely to suffer irreparable harm. *See, e.g.*, *Platt v. Bd. of Com'rs on Grievances and Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 455 (6th Cir. 2014) (holding that plaintiff in First Amendment case had "not shown irreparable harm[] largely because he has not demonstrated a strong likelihood of success on the merits").  "Likewise, the determination of where the public interest lies also is dependent on a determination

---

[2] The Court's conclusion above that Booth has not shown a substantial likelihood of success on his facial challenge to the Negative Perception Provision is not a final ruling on Booth's facial challenge to that provision.  As with his challenges to the other provisions of the Social Media Policy, and as explained in more detail in footnote one above, Booth may uncover facts during discovery that the Negative Perception Provision was enacted for an improper purpose or is subject to serious misuse.  For these reasons, the Court previously denied Defendants' motion to dismiss Booth's claims and concluded that a final decision on the constitutionality of all aspects of the Social Media Policy is best made on a full factual record.

of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distributing Co.*, 154 F.3d at 288 (internal quotation marks omitted). And here, Booth has not shown the public has an interest in enjoining any part of the Social Media Policy because has not shown a strong likelihood that the policy violates the First Amendment. Finally, Defendants and the MDOC would be harmed if the Court enjoined enforcement of a policy that has not been shown to be likely unconstitutional. *See id.* Thus, none of these factors support preliminary injunctive relief.

## V

For all of the reasons explained above, Booth's motion for a preliminary injunction (ECF No. 6) is **DENIED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: December 2, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 2, 2022, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126